UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

**MAYRA MILLAN, et als.,**
Plaintiffs

CIVIL NO. 02-2687(DRD)

v.

**HOSP. SAN PABLO, et als.,**
Defendants

## <u>ORDER</u>

Before the Court are defendants Hospital San Pablo, Inc.; Hospital Hermanos Melendez; American International Insurance Company; doctor Edgardo Feliciano; Sistema Integrado de Atencion Pediatrica ("SIAP"); doctor Mario E. Paulino Payano; and Sindicato de Aseguradores para la Subscripcion Conjunta de Seguros de Responsabilidad Profesional Medico-Hospitalaria's ("SIMED") respective *Motions for Summary Judgment*. (Docket Nos. 114, 117, 119, 121, and 126, respectively). Plaintiffs duly opposed all requests for summary judgement through an *Omnibus Opposition* (Docket No. 130) which was then timely replied by Hospital San Pablo, Inc., SIAP, and SIMED (Docket Nos. 156, 155, and 153, respectively). Although Hospital Hermanos Meledez and AIICO also filed a reply (Docket No. 158), having done so in an untimely fashion, said reply was denied by the Court. (Docket No. 162). In similar fashion, plaintiffs' sur-reply (Docket No. 159) was denied for having been filed in an untimely fashion. (Docket No. 162).

After analyzing the submissions and because there are genuine issues as to material facts that persist, <u>Cortes Irizarry v. Corporacion Insular</u>, 111 F.3d 184, 187 (1ˢᵗ Cir. 1997), co-defendant hospitals' requests for *brevis* disposition are **DENIED**. Finally, Dr. Paulino, Dr. Feliciano, and SIAP's requests are **DENIED IN PART AND GRANTED IN PART**.

## I. SUMMARY JUDGMENT STANDARD

The framework of Fed.R.Civ.P. 56 provides that it is appropriate to enter summary judgment

when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). *See* Celotex Corp v. Catrett, 477 U.S. 317, 324-25, 106 S.Ct. 2548, 2553-54 (1986); Abbadessa v. Moore Business Forms, Inc., 987 F.2d 18, 22 (1st Cir. 1993). Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," *and* that he is "entitled to judgment as a matter of law." Vega-Rodriguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997). When the moving party asserts that the competent evidence clearly demonstrates that it is entitled to judgment and after the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." Cortes-Irizarry v. Corporacion Insular, 111 F.3d 184, 187 (1st Cir. 1997).

To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trial worthy issue as to any material fact. *See* Perez v. Volvo Car Corporation, 247 F.3d 303, 310 (1st Cir. 2001); Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000); Cortes-Irizarry v. Corporacion Insular, 111 F.3d 184, at187; McIntosh v. Antonino, 71 F.3d 29, 33 (1st Cir. 1995) (the Court must look behind the facade of the pleadings alleged in the complaint, in this case the *Third Amended Complaint* (Docket No. 59) and examine the parties proof in order to determine whether a trial is required.). Furthermore, a fact is "material" if it potentially could affect the suit's outcome. *See* Id. An issue concerning such a fact is "genuine" if a reasonable fact finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor. *See* Id. The

Court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000).

This is so, because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *See* Reeves, id. There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood[.]" Greenburg v. Puerto Rico Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). "The Court should give credence to the evidence favoring the non-movant as well as the evidence supporting the moving party that is contradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." Id. An absence of evidence on a critical issue weighs against the party  –be it the movant or the non-movant–  who would bear the burden of proof on that issue at trial. *See* Perez v. Volvo Corporation, 247 F. 3d at 310; *see also* Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35-36 (1st Cir. 1998); Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). Accordingly, "speculation and surmise, even when coupled with effervescent optimism that something definite will materialize further down the line, are impuissant on the face of a properly documented summary judgment motion." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996) (*citations omitted*).

At the summary judgment stage, the trial court examines the entire record "in the light most flattering to the non-movant and indulges all reasonable inferences in that party's favor.  Only if the record, viewed in the manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." Cadle Company v. Hayes, 116

F.3d 957 at 959-60 (1st Cir. 1997).  In other words, the court must construe the record and all reasonable inferences from it in favor of the non-movant (the party opposing the summary judgment motion). *See* <u>Suarez v. Pueblo Int'l, Inc.</u>*,* 229 F.3d 49, 53 (1st Cir. 2000); <u>Cortes-Irizarry</u>, 111 F. 3d at 187; *see also* <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).  Moreover, "[i]f the adverse party does not [file an opposition], summary judgment, **if appropriate**, shall be entered against the adverse party." Fed.R.Civ.P. 56(e) (emphasis added).  The First Circuit Court of Appeals has made clear that failure to timely oppose a motion for summary judgment, does not, in itself, justify entry of summary judgment against the party; therefore, a District Court is "obliged to consider the motion on the merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate." <u>Kelly v. United States</u>, 924 F.2d 355, 358 (1st Cir. 1991); *see also* <u>Lopez v. Corporacion Azucarera de Puerto Rico</u>, 938 f.2d 1510, 1517 (1st Cir. 1991) (holding that before granting an unopposed summary judgment motion, the court must inquire whether the moving party has met its burden to demonstrate undisputed facts entitling it to summary judgment as a matter of law).  In the case of failure to oppose a motion for summary judgment, the consequence "is that the party may lose the right to file an opposition." <u>Mullen v. St. Paul Fire & Marine Ins. Co.</u>, 972 F.2d 446, 451-52 (1st Cir. 1991) (discussing unopposed motion for summary judgment).  Finally, **a party that fails to oppose a motion for summary judgment, does so at its own risk and peril**.  *See e.g.* <u>Corrada Betances v. Sea-Land Services, Inc.</u>, 248 F.3d 40, 43 (1st Cir. 2001); <u>Herbert v. Wicklund</u>, 744 F.2d 218, 233 (1st Cir. 1994).  However, notwithstanding that there is no opposition to a summary judgement, the Court must entertain the motion on the merits and may not grant the same as a sanction even for failure to file an opposition.  *See* <u>De la Vega v. San Juan Star</u>, 377 F. 3d 111(1st Cir. 2004).

## II.  FACTUAL BACKGROUND

Plaintiffs have filed the instant complaint for damages resulting from the wrongful death of baby boy Joseph Bermudez Millan, three and a half months old at the time of his death, after having been treated in two different hospitals on two different dates, as well as an intermediate visit to a free standing medical facility.  Plaintiffs aver this Court's jurisdiction pursuant to the provisions of the federal Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd. They also invoke supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) for they claim damages under Article 1802 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 5141, for medical malpractice against the treating physicians at the emergency rooms, and against the caring hospitals.

Plaintiffs allege that baby Joseph's medical condition, i.e. coughs (initially non-productive, and later with phlegm), and slight fever, was not appropriately screened by the medical personnel of the defendant hospitals, and that he was discharged home while still in an unstable condition. According to the plaintiffs, on the evening of November 21, 2001, three and a half month old baby Joseph was taken to the emergency room of Hospital Hermanos Melendez (HHM) with major complains of asphyxiating coughs.  At that time, the parents informed the physician that the baby had a prior history of bronchial asthma.  Dr. Jose Cobos, pediatric physician in charge at that time, took the patient's history, and performed a physical exam.  He then ordered a CBC and differential, chest X-rays, and treatment for the baby.  Even though Dr. Cobos found "wheezes" and "roncus", he determined the baby was in good general condition.  Later that evening, at midnight, Dr. Mario Paulino Payano began his shift substituting Dr. Cobos.  He reviewed the patient's medical record, discussed it with Dr. Cobos, and proceeded to auscultate baby Joseph.  Upon re-evaluation of baby Joseph, the laboratory results, and X-rays, Dr. Paulino noted that the patient had responded

adequately to respiratory therapy, was not in distress, did not have a fever, coughs, or vomits. Accordingly, he explained to the mother that she should visit the baby's pediatrician the next day because the X-ray was compatible with mild bronchiolitis and proceeded to discharge the patient in stable condition, without a fever, without distress, and alert. Dr. Paulino prescribed medicine, and respiratory therapy, and instructed the mother to return to the hospital if the baby showed any signs of deterioration. *See* Exhibit I, Docket No. 147. The mother could not visit her pediatrician the next day, or the next 4 days, for that matter, due to the date coinciding with the Thanksgiving weekend and her pediatrician being unavailable.

On Sunday evening, November 25, 2001, baby Joseph's parents took him to the Bayamon Health Center (a free standing medical facility and non-party to this claim) after baby Joseph had vomited during a theater performance in Old San Juan wherein the baby was with his parents. Once there, he was evaluated by Dr. Esteban Perez treating the child with further respiratory therapy. As per Dr. Perez's deposition, he did not feel comfortable discharging the patient without having a pediatrician evaluate him first. Consequently, Dr. Perez transferred baby Joseph to Hospital San Pablo at around midnight. From the medical record produced in San Pablo, it stems that the patient arrived complaining of fever, phlegm, coughs, and respiratory difficulty. However, the Emergency Room Medical Record clearly states that the general exam gave "good" results with only "early bronchiolitis" as the diagnostic impression. It further states that, upon follow-up, the X-ray was negative, he responded well to respiratory and other treatments and his physical exam was "good". Accordingly, he was discharged with instructions to follow-up within two days. Pursuant to the record, his condition at disposition was "good" and "stable". *See* Exhibit V, Docket No. 117.

Finally, on Tuesday, November 27, 2001, after having woken up well and having spent the

previous day eating and sleeping well, baby Joseph's mother took him to his day care center.  While at the day care center, baby Joseph ate well and was, thus, placed in his crib for a nap. Unfortunately, when the caretaker went to check on baby Joseph, she found him cold, stiff and purple.  He died not having any symptoms of any medical trouble at the day care center.  She then called 911, and proceeded to give him CPR until the paramedics arrived.  Baby Joseph was taken to HHM's emergency room where he arrived cyanotic, rigid, cold, and without any vital signs.  He was declared dead on arrival.  *See* Exhibit VI, Docket No. 147.

Plaintiffs filed this action on November 15, 2002, then filed a *First Amended Complaint* (Docket No. 40).  Plaintiffs' alleged causes of action under EMTALA are summarized as follows: 1) breach of duty to provide appropriate screening, and 2) breach of duty to stabilize before discharge.  Co-defendants Hospital San Pablo, Inc.; Hospital Hermanos Melendez, and American International Insurance Company; Dr. Edgardo Feliciano; Sindicato de Aseguradores para la Subscripcion Conjunta de Seguros de Responsabilidad Profesional Medico-Hospitalaria filed requests for summary judgment stating, in essence that baby Joseph was properly evaluated at the emergency rooms visited, and then discharged after having been found in stable condition.  Dr. Mario E. Paulino and SIAP, in turn, purport that summary judgment should be granted in their favor provided that EMTALA does not provide for a private cause of action against individual physicians, or against physician medical corporations.  The herein defendants are, in sum, contesting this Court's federal question jurisdiction over plaintiffs' claims.

### III.  ANALYSIS

The Court now examines the applicable statutory provisions, "taking the record in the light most hospitable" to plaintiffs, and "indulging all reasonable inferences in [their] favor."  Griggs-

Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

**A)     The Various Hospitals' Requests:**

The Court of Appeals for the First Circuit interpreted the EMTALA, for the first time, in the case of Correa v. Hospital San Francisco, 69 F.3d 1184 (1st Cir. 1995).  The Court explained the statute's congressional history; "[a]s health-care costs spiraled upward and third-party payments assumed increased importance, Congress became concerned 'about the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance.'  H.R.Rep. No. 241(I), 99th Cong., 1st Sess. 27 (1986), reprinted in 1986 U.S.C.C.A.N. 42, 605.  Thus, Congress enacted EMTALA to allay this concern." Id., at 1189.

The EMTALA federal statute was, thus, enacted in 1986 in response to a distinct and narrow problem--namely, the national concern that uninsured, underinsured, and indigent patients were being "dumped" onto other hospitals, and/or dumped and/or discharged by hospitals who did not want to treat them.  *See* Rivera Marrero v. Hospital Hermanos Melendez, 253 F.Supp.2d 179; *see also* Summers v. Baptist Medical  Center Arkadelphia, 91 F.3d 1132, 1136 (8th Cir.1996); Correa, 69 F.3d at 1189; Baber v. Hosp. Corp. of America, 977 F.2d 872, 880 (4th Cir.1992); Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1039 (D.C.Cir.1991).  The Act was intended to create a wholly new cause of action to address this narrow health problem, separate and distinct from traditional state medical malpractice claims.  Id.  As such, Section 1395dd(d)(2)(A) grants a personal right of action to "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section."

On the other hand, numerous courts have noted explicitly that the EMTALA is not to be

treated like a federal malpractice statute.  Id.; *see also  ee* Marshall v. East Carroll Parish Hosp., 134

F.3d 319, 322 (5th Cir.1998); Summers, 91 F.3d at 1137; Vickers v. Nash Gen. Hosp., 78 F.3d 139,

142 (4th Cir.1996); Correa, 69 F.3d at 1192-93.[1]

     In the medical context, EMTALA requires a participating hospital (defined as a hospital that

has entered into Medicaid provider agreements under section 1395cc of Title 42), that has an

emergency department, to provide an "**appropriate medical screening**" to any individual who

presents himself or herself to the emergency room and requests an examination or treatment for a

medical condition.  *See* 42 U.S.C.A. § 1395dd(a), (e)(2); 42 U.S.C.A. § 1395cc; Mayda Lopez-Soto

v. Hawayek, 175 F.3d at 172.  Furthermore, Section 1395dd(d)(2)(A) grants a personal right of

action to "[a]ny individual who suffers personal harm as a direct result of a participating hospital's

violation of a requirement of this section."  In describing the private cause of action, the Court of

Appeals for the First Circuit stated that,   [t]o establish an EMTALA violation, a plaintiff must show

that (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency

department[;] (2) the patient has arrived at the facility seeking treatment; and (3) the hospital [ ] did

not afford the patient an appropriate screening in order to determine if he or she had an emergency

medical condition[.]  *See* Correa v. Hosp. San Francisco, 69 F.3d at 1190 (citing Miller v. Medical

Center of S.W. Louisiana, 22 F.3d 626, 628 (5th Cir.1994); Stevison by Collins v. Enid Health Sys.,

Inc., 920 F.2d 710, 712 (10th Cir.1990)).

     The Act does not require a covered hospital to provide a uniform minimum level of care to

each patient seeking emergency care and does not provide a private cause of action against a treating

---

[1]  See also, Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1258 (9th Cir.1995); Repp v. Anadarko
Municipal Hosp., 43 F.3d 519, 522 (10th Cir.1994); Holcomb v. Monahan, 30 F.3d 116, 117 (11th Cir.1994); Baber,
977 F.2d at 879-80; Gatewood, 933 F.2d at 1041.

hospital for misdiagnosis or improper medical treatment, areas traditionally covered by state malpractice law.  *See* Marshall, 134 F.3d at 322; Summers, 91 F.3d at 1137; Vickers, 78 F.3d at 142; Holcomb, 30 F.3d at 117; Baber, 977 F.2d at 880.[2]  The Court of Appeals for the First Circuit has stated that "[t]he essence of the requirement is that there be some screening procedure, and that it be administered even- handedly." Correa, 69 F.3d at 1192.

The First Circuit Court defined "appropriate medical screening" and specifically stated, "[a] hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination **reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients** and provides the level of screening uniformly to all those who present substantially similar complaints.... **[Thus] a refusal to follow regular screening procedures in a particular instance contravenes the statute**, but faulty screenings in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute." Correa, 69 F.3d at 1192-93.

"[A] hospital fulfills the 'appropriate medical screening' requirement when it conforms in its treatment of a particular patient to its standard screening procedures. By the same token, **any departure from standard screening procedure constitutes inappropriate screening in violation of the Emergency Act**."  Freighery v. York Hospital, 59 F.Supp.2d 96, 104 (D. Maine 1999); *see also* Repp, 43 F.3d at 523. (Emphasis added).  Furthermore, the statute by its terms directs a participating hospital to provide an appropriate screening to all who come to its emergency room. Hence, in order to prove a violation of EMTALA's screening provisions, a plaintiff need not prove

---

[2] Gatewood, 933 F.2d at 1041; (citing Barry R. Furrow, An Overview and Analysis of the Impact of the Emergency Medical Treatment and Active Labor Act, 16 J. Legal Med. 325 (Sept.1995)); Tank, 941 F.Supp. at 972.

that [he] she actually suffered from an emergency medical condition when [he] she first came through the portals of the defendant's facility; the failure to appropriately screen, by itself, is sufficient to ground liability as long as the other elements of the cause of action are met.  *See* Correa, 69 F.3d at 1190.

"[H]ospitals are expected to employ **'ancillary services routinely available to the emergency department'** in order to identify such conditions." Del Carmen Guadalupe v. Negron Agosto, 299 F.3d 15, 19 (1st Cir.. 2002). (Emphasis added). There "is both a substantive and a procedural component to an appropriate medical screening under EMTALA: '[a] hospital fulfills its statutory duty to screen patients in its emergency room if it provides **for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients** and provides that level of screening uniformly to all those who present substantially similar complaints'." Id. (Emphasis added); see also, Jackson v. East Bay Hosp., 246 F.3d 1248, 1256 (9th Cir.2001) ("We hold that a hospital satisfies EMTALA's 'appropriate medical screening' requirement if it provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, **unless the examination is so cursory that it is not 'designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury**.' " (quoting Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1257 (9th Cir.1995))). (Emphasis added).

The second prong of the test to determine whether federal jurisdiction is proper under EMTALA is **whether the duty to stabilize the patient before transfer/discharge is complied with**.  Subsection (b) of 42 U.S.C. § 1395dd, rather than imposing the Hospital's duty to triage and screen, focuses on the Hospital's statutory duty to stabilize.  Thus, if "any individual ... comes to a

hospital and the hospital determines that the individual has an emergency medical condition," the hospital must try to stabilize that condition, and can shift the patient to another institution only in accordance with EMTALA's transfer provisions.  42 U.S.C. § 1395dd(b).  *See* <u>Lopez-Soto v. Hawayek</u>, 175 F.3d at 173.  **Within such terms, the hospital must provide either, (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or; (B) for transfer of the individual to another medical facility in accordance with subsection (c). 42 U.S.C. § 1395dd(b). "Once the hospital makes the determination that the patient is suffering from an emergency condition, the hospital must provide reasonable treatment to stabilize the patient's emergency situation before discharging or transferring him or her"**.  *See* 42 U.S.C. § 1395dd(e)(3)(A).

EMTALA defines the duty to stabilize as the duty "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]"  <u>Id.</u>  As with screening, "in determining whether a patient has been stabilized, **the fact- finder must consider whether the medical treatment and subsequent release were reasonable[,] in view of the circumstances that existed at the time the hospital discharged** or transferred the individual."  <u>Torres Otero v. Hospital General Menonita</u>, 115 F.Supp.2d 253, 259 (D.P.R. 2000) (Emphasis added); quoting  <u>Delaney v. Cade</u>, 986 F.2d 387, 393 (10th Cir.1993). "Liability under EMTALA does not hinge on the result of the plaintiff's condition after the release, but rather on whether the hospital would have considered another patient in the  same condition as too unstable to warrant his or her release or transfer".  <u>Id</u>., at 260.

As can be undoubtedly inferred from the above explanation, the duty to appropriately screen

is independent from the duty to stabilize.  The duty to stabilize is defined in the statute itself, and speaks of the requirement that a hospital provide treatment to assure that "no material deterioration of the condition is likely to result from or occur during the transfer [or discharge]."  42 U.S.C. § 1395dd(3)(A).  In other words, "the duty to stabilize exists not in a vacuum, but rather in reference to a transfer of the patient from the hospital".  Torres Otero, 115 F.Supp.2d at 260.  **Thus, a hospital violates its duty to stabilize under EMTALA when it fails to stabilize a patient before transferring or discharging him or her**.  *See* Correa, 69 F.3d at 1190.[3]  (Emphasis added). However, it is "only if th[e] screening uncovers an emergency medical condition [that] the hospital [must] stabilize the patient and refrain from transferring him except in compliance with the statutory commands, *see* 42 U.S.C. § 1395dd(b)-(c)."  Lopez-Soto v. Hawayek, 175 F.3d at 172.  If no emergency condition is detected, there is no duty to stabilize.

The Court having scrutinized the facts in the light most favorable to Plaintiffs, determines there is no question that Plaintiffs are basing their EMTALA claim on failure to comply with the individual hospitals' duty to stabilize before discharge.  The record clearly shows that two different hospitals proceeded to carry forth the same tests on baby Joseph when he was brought to the emergency room – general examinations, CBCs, X-rays, respiratory treatments, among others – and that both emergency room physicians arrived at the same diagnosis – early bronchiolitis.  In fact, in their opposition to the varied requests for *brevis* disposition, plaintiffs center their discussion on how both their expert witnesses reported that the co-defendant hospitals should not have discharged

---

[3]  There is no duty to stabilize unless the hospital "has actual knowledge of the individual's unstabilized emergency medical condition" Summers, 91 F.3d at 1140; Vickers v. Nash. Gen. Hosp, 78 f.3d 139, 145 (4th Cir. 1996) ("[t]he Act does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware.").  However, Co-defendant's Hospital factual theory is that they knew the condition treated, and proceeded to stabilized the patient.

baby Joseph after they had ascertained, through the examinations performed, that the patient had bronchial asthma rather than the hospitals' perfunctory inappropriate initial screening of baby Joseph.  But the Court concludes that proper screening was, in fact carried out well by the co-defendant hospitals.

Nevertheless, under the EMTALA, the co-defendant hospitals still had to verify that baby Joseph had been stable at the moment of discharge.  A hospital's duty is "to provide such medical treatment of the condition as may be necessary to assure, within a reasonable medical probability, that no material deterioration of the condition is likely to result from or occur."  42 U.S.C. § 1395dd(e)(3)(A).  **"The duty to stabilize is therefore greater than the duty to screen".**  Matter of Baby K, 16 F.3d 590, 595-96 (4th Cir.1994), *cert. denied*, 513 U.S. 825, 115 S.Ct. 91, 130 L.Ed.2d 42 (1994); as quoted in Fuentes Ortiz, 106 F.Supp.2d at 332-333 (*emphasis ours*).  Here is where the Court harbors legal doubt as to whether co-defendants acted appropriately following the standard of examining the record "in the light most flattering to the non-movant and indulg[ing] all reasonable inferences in that party's favor."  Cadle Company v. Hayes, 116 F.3d 957 at 959-60.

There are genuine issues of fact as to whether the Hospitals stabilized baby Joseph prior to discharging him. Regarding that, the Court merely needs to address Plaintiffs' version of facts, further supported by the medical record, depositions and sworn statements on file,  to conclude that co-defendant's assertions that it stabilized the patient are contradicted.  Moreover, the record does not contain sufficient evidence as to how each one of the co-defendant hospitals reasonably verified with certitude that the baby patient was stable pursuant to hospital regulations.

Co-defendant hospitals contend that they each complied with their duty to stabilize in that they made sure that the patient's medical condition had been treated before discharging him – and

so the records reflect. The hospitals further aver that both physicians at the emergency rooms concluded that bronchial asthma and/or early bronchiolitis causing the coughs, the temporary fever, and the respiratory difficulty had been sufficiently treated to stabilize baby Joseph, and that there was no doubt that the treating physicians in the emergency rooms understood that the patient was stable when he was discharged home with specific instructions as to home care which the mother affirmed she understood and further instructions to promptly visit the baby's pediatrician. However, the expert witnesses brought forth by plaintiffs specifically contradict such allegations. The Court explains.

Expert witness doctor Miguel Fernandez Barreras opines that both HHM and San Pablo, "through their emergency departments, contractors, physicians and employees failed to provide emergency medical care to Baby boy Bermundez-Millan." *See* Exhibit 8, Docket No. 130. Furthermore, said report contends that the diagnostic impressions of bronchial asthma made by the physicians by themselves imply that both physicians identified a true emergency condition and failed to provide the whole management and medical care to the patient that the emergency warranted before they discharged him. Id. Finally, in his deposition, Dr. Fernandez states that, even though the laboratory tests were within normal limits, the hospitals' records suggest that plaintiff baby Joseph was not sufficiently stable to be discharged. *See* Exhibit 9, Docket No. 130. Doctor Ron D. Waldrop, plaintiffs' other expert witness, reaches a similar conclusion. In his report, doctor Waldrop opines that by HHM failing to document objective improvement in the condition of baby Joseph, there is no objective evidence in the medical records of the child's medical stability at the time of discharge. Consequently, HHM violated the EMTALA. Dr. Waldrop also concludes that San Pablo also infringed the EMTALA's provisions by not conducting further workup and by not

hospitalizing baby Joseph in order to identify the source of the fever when San Pablo had knowledge that baby Joseph had previously been diagnosed with bronchiolitis, and by failing to recognize that the risk of bacterial superinfection was high.  Similarly, according to said expert, notwithstanding the record, the stability of the child was unknown at the time of discharge from the hospital.  *See* Exhibit 12, Docket No. 130.  Both hospitals' records undoubtedly assert that baby Joseph's condition at the time of discharge was that of "no fever, alert, no distress", and "good, stable". However, plaintiffs' experts conclude through their opinions after scrutinizing the hospitals' records that the lack of sufficient documented objective vital signs at the time of discharge from HHM, and the mere reliance on the child's appearance accompanied by a normal chest x-Ray at the time of discharge from San Pablo is meager evidence of baby Joseph's stability at time of discharge.  The Court must, therefore, leave the issue to be resolved by a jury's weighing of the hospitals' documented record against the opinion of plaintiffs' experts suggesting that the records were insufficient.  *See* Reeves, 530 U.S. at 150 (holding that "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

Without entering into an opinion one way or the other as to credibility, properly assessing this argument involves weighing of facts which the Court is banned from performing at this stage. Furthermore, co-defendants' argument that they each stabilized the patient before discharge is precisely the issue of material fact that is in controversy and must be left to the fact finder to decide. Accordingly, Hospital San Pablo, Inc.; Hospital Hermanos Melendez, and American International Insurance Company; and SIMED's respective request for Summary Judgment (Docket Nos. 114, 117, and 126) are **DENIED** as the matter involves an issue of weight of contradicting opinions by

two experts[4] which is a finding of the jury.  <u>Kennedy v. Josephthal Co. Inc.</u>, 814 F.2d 798, 804 (1st Cir. 1987).[5]

**B)      SIAP's Request:**

In its request for *brevis* disposition (Docket No. 121), SIAP (a physicians medical group private corporation) argues that only participating hospitals, as defined by the statute, may be sued under the EMTALA and, provided that SIAP is not a participating hospital, plaintiffs cannot sue it pursuant to said statute.

The court harbors no doubt that there is no cause of action against physicians under EMTALA.  *See generally* <u>Lebrón v. Ashford Prebysterian Community Hospital</u>, 995 F. Supp. 241 (D.P.R. 1998) (including compendium of cases).  Although the First Circuit Court of Appeals has yet to resolve this the controversy, it must be noted that other sister circuits have uniformly decided the issue handily rejecting a cause of action against physicians under EMTALA.  *See* <u>Eberhardt v.City of Los Angeles</u>, 62 F.3d 1253 (9th Cir. 1995); <u>King of Ahrens</u>, 16 F.3d 265 (8th Cir. 1994); <u>Delaney v. Cade</u>, 986 F.2d 387 (10th Cir. 1993); <u>Baber v. Hospital Corp. of America</u>, 977 F.2d 872, 879 (4th Cir. 1992); <u>Gatewood v. Washington Corp.</u>, 933 F.2d 1037 (D.C. Cir. 1991).

> The statute's legislative history makes it clear that, far from intending to allow patients to sue doctors, Congress intentionally limited patients to suits against hospitals.

<u>Baber</u>, 977 F.2d at 877.  It must also be noted that this particular district has upheld said analysis.

---

[4]  The Court's opinion as to the weight of the evidence of the contradictory medical opinions is immaterial, even if the Court strongly disagrees with the plaintiffs' experts' opinions.  *See* <u>Reeves</u>, 530 U.S. at 150.

[5]  The Court further notes that the ultimate decision is one of "knowledge" by a party derived from circumstantial evidence, which is a matter to be determined by the jury unless there is "smoking gun" evidence as to said particular knowledge. <u>Tew v. Chase Manhattan Bank, N.A.</u>, 728 F.Supp.1551, 1555 (S.D.Fla. 1990).

*See* Alvarez Torres v. Hospital Ryder Memorial, Inc., 308 F.Supp.2d 38, 40 (D.P.R. 2004); Feliciano Rivera v. Medical & Geriatric Administrative Services, Inc., 254 F.Supp.2d 237 (D.P.R. 2003); Medero Diaz v. Grupo de Empresas de Salud, 112 F.Supp.2d 222, 225 (D.P.R. 2000) (holding that EMTALA does not provide a private cause of action against individual physicians or against physicians' medical corporations).

In the instant case there is no federal jurisdiction over the defendants doctors or the physicians' medical corporation SIAP. Nevertheless, there is also no doubt that the claims against the doctors in the instant case "are so related to claims in the action within such original jurisdiction that they form part of the same case and controversy." 28 U.S.C.A. 1367. Which brings the Court to the following issue related to supplemental jurisdiction: there being some parties present wherein their state claim is alive, but not the federal claim; and there exists another party where there remains a federal claim, "could pendent or ancillary jurisdiction be used to support the state claim against that party even thought that party was not subject to the federal claim?" This legal issue is known as "pendent party jurisdiction." David D. Siegel, Practice Commentary, "The 1990 Adoption of § 1367, codifying "Supplemental" Jurisdiction," 28 U.S.C.A. 1367, West Publishing, 1993, p. 829-838.

Pendent party jurisdiction was initially rejected by the Supreme Court in the case of Finley v. United States, 490 U.S. 545, 109 S. Ct. 2003 (1989); Aldinger v. Howard, 427 U.S. 1, 96 S. Ct. 2413 (1976). Therein, the Supreme Court held that Congress had the power to constitutionally establish pendent party jurisdiction but Congress had not expressly activated the directive. But Congress acted later. In 1990, Congress added a last sentence at Subdivision (a) of § 1367 providing that "supplemental jurisdiction shall include claims that involve the joinder or intervention of

additional parties."  Explaining said inclusion, the author of the Commentary at 28 U.S.C.A. 1367, David D. Siegel, concluded that "with the last sentence, *Finley* and *Aldinger* are overruled and pendent party jurisdiction is allowed but with the big proviso in diversity cases as provided in Subdivision (b) of § 1367."[6]

Since the instant case is **not** a diversity claim but a federal question arising under 28 U.S.C.A. 1331, the court must exercise jurisdiction over parties even though said parties were not subject to the federal claim when said parties' claims form part of the same case and controversy and

---

[6] Siegel's opinion is based on a review of the legislative history of the 1990 amendments to the Supplemental Jurisdiction law, known as The Judicial Improvement Act of 1990 (Pub. L. 101-650).  Furthermore, Erwin Chemerinski in Federal Jurisdiction, 4th Edition, Aspen Publishers 2003, p. 338-341, agrees *in toto* with the conclusions set forth above by David D. Siegel:

> Pendent party jurisdiction is the authority of the federal court to hear claims against additional parties, over which it would not otherwise have jurisdiction because these claims arise from a common nucleus of operative facts . . . if [for example] a plaintiff brings federal claim against one defendant and a state law claim, arising from the same set of facts, against a second defendant, may the federal court entertain the same [notwithstanding that the court would not otherwise have jurisdiction over the second defendant.] [ ] The 1990 Act was specifically intended to overrule *Finley v. United States*, where the Supreme Court held that pendent party jurisdiction is not permitted without specific statutory authorization. In *Finley*, the plaintiff was a woman whose husband and children died when an airplane struck electric power lines.  Initially, the plaintiff filed suit in state court against the San Diego Gas and Electric Company for negligently maintaining the lights on the airport runway. Subsequently, the plaintiff learned that the Federal Aviation Administration (FAA) was responsible for the runway lights. The plaintiff then sued the FAA in federal court under the Federal Tort Claims Act. She sought to amend her federal court complaint to include as a defendant the utility company against whom she only had state law claims. In other words, *Finley* presented a classic case of pendent party jurisdiction: an attempt to invoke federal court jurisdiction over an additional party (over whom there is no independent basis for federal court jurisdiction) because the claim arises from the same facts as a federal question properly before the federal court.

> The Supreme Court, in a five-to-four decision, held that pendent party jurisdiction is not permissible unless there is an express statutory authorization for it. The Court concluded that nothing in the Federal Tort Claims Act authorizes jurisdiction over pendent parties. The Court distinguished pendent claim jurisdiction, which it reaffirmed as permissible, from what it viewed as the "much more radical" concept of pendent party jurisdiction.

> The Federal Courts Study Committee proposed overruling *Finley* to allow pendent party jurisdiction. Congress adopted this recommendation and §1367(a) expressly provides that "supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." Lower courts have followed this and now allow pendent party jurisdiction under the statutory authorization for supplemental jurisdiction.

there exists at least one party with a federal claim remaining.  Moreover, in <u>Ponce Federal Bank v.</u> <u>The Vessel Lady Abby</u>, 980 F.2d 56, 57-59 (1st Cir. 1992), the then Circuit Chief Judge, now Associate Supreme Court Justice, Stephen Bryer, discussed "pendent party jurisdiction" as herein defined[7] and allowed the prosecution of a non-federal civil claim related to the federal cause of action "if the claims involve a common nucleus of operative facts, a single proceeding to decide both seems eminently fair."  <u>Ponce Federal Bank v. The Vessel Lady Abby</u>, 980 F.2d at 58.  Further, Justice Bryer expressly clarified that although the case pre dated the 1990 Supplemental Jurisdiction statute, the final result would have been the same and, moreover, "Congress yet more recently has passed a statute that overturns Finley, 28 U.S.C.A. § 1367."  <u>Ponce Federal Bank</u>, <u>Id.</u>  Other circuits that have focused on the issue have concluded as opined by Commentators Siegel and Chemerinski. *See* <u>Rodríguez v. Pacificare of Texas</u>, 980 F.2d 1014, 1018 (5th Cir. 1993) ("Congress has now spoken, as part of the Judicial Improvement Act of 1990, 104 Stat. 5089, et seq., district courts are now granted "supplemental jurisdiction" [referring to specifically pendent party jurisdiction] over claims so related to a federal question" since they form part of the same case or controversy under Article III of the United States Constitution), <u>Shombergh Metal Works, Inc. v. Press Mechanical,</u> <u>Inc.</u>, 77 F. 3d 928, 931 (7th Cir. 1996) (pendent party jurisdiction is now available after 1990 amendments to 28 U.S.C.A. 1367 even in diversity cases; <u>Baer v. First Options of Chicago</u>, 72 F.3d 1294, 1298 (7th Cir. 1995) (pendent party jurisdiction accepted as previously authorized in" judge-made principles").  The District Court of Puerto Rico has also followed then Chief Judge Bryer's analogies in *Ponce Federal Bank* as well as Professors Siegel and Chemerinski in the case of

---

[7]  Pendent party jurisdiction is distinct from pendent claim jurisdiction.  Pendent claim jurisdiction commenced in <u>Siler v. Louisville & N.R. Co.</u>, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909).  Once a court has federal jurisdiction, it may resolve other state claims amongst the parties even though the court ultimately decides adversely the federal claim.  <u>Id.</u> At 191.

Alvarez Torres. 308 F.Supp.2d at 40-42.

Accordingly, although there is no cause of action under EMTALA against the herein physicians and/or physician's medical corporation, the court has supplemental "pendent party jurisdiction" because there exists a common nucleus of operative facts present as to the potential cause of action against the defendant physicians, and there is still pending a federal claim against another co-defendant remaining, their request for summary judgment are **GRANTED IN PART** – as to the federal EMTALA claims – and **DENIED IN PART** – as to the state claims for medical malpractice.

## III.  CONCLUSION

**WHEREFORE**, for the reasons above stated, **Hospital San Pablo, Inc.** (Docket No. 114)**;** **Hospital Hermanos Melendez, Inc., and AIICO** (Docket No. 117)**;** and **SIMED's** (Docket No. 126) requests for Summary Judgment are **DENIED**.  On the other hand, **Dr. Edgardo Feliciano** (Docket No. 119)**; SIAP** (Docket No. 121)**;** and **Dr. Mario Paulino's** (also Docket No. 126) requests for Summary Judgment are **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico this 8th day of September of 2005.

<u>s/ Daniel R. Dominguez</u>
**DANIEL R. DOMINGUEZ**
**U.S. DISTRICT JUDGE**